IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DAVID ALLAN VIRGO,

              Petitioner,

vs.

SCOTT FRAUENHEIM, Warden, Pleasant
Valley State Prison,[1]

              Respondent.

No. 2:15-cv-01518-JKS

MEMORANDUM DECISION

David Allan Virgo, a state prisoner represented by counsel, filed a Petition for a Writ of

Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Virgo is in the custody of the

California Department of Corrections and Rehabilitation and incarcerated at Pleasant Valley

State Prison. Respondent has answered, and Virgo has replied.

I. BACKGROUND/PRIOR PROCEEDINGS

On November 23, 2007, Virgo was charged with the premeditated attempted murder of

ten peace officers (Woo, Lockhart, Glau, Franz, Steinhauer, Powers, Tindall, West, Conners, and

Kemper, Counts 1, 3, 5, 7, 9, 11, 13, 15, 17, and 19, respectively), with assault with a firearm

and personally using a firearm against those same officers (Counts 2, 4, 6, 8, 10, 12, 14, 16, 18,

and 20), and with being a felon in possession of firearms (Counts 21 and 22). The information

further alleged that Virgo personally and intentionally discharged a firearm and that Virgo had

been convicted of, and served a separate prison term for, two vehicle thefts in 1995, possession

of drugs in 1997, possession of a firearm by a felon in 1998, and vehicle theft in 2003. Virgo

---

[1]      Scott Frauenheim, Warden, Pleasant Valley State Prison, is substituted for Stu
Sherman, Warden, California Substance Abuse Treatment Facility and State Prison. FED. R.
CIV. P. 25(c).

pleaded not guilty and proceeded to a jury trial in July 2010. On direct appeal of his conviction,

the California Court of Appeal laid out the following facts underlying the charges against Virgo

and the evidence presented at trial:

> In 2006, [Virgo] was a parolee at large, and the Placer County Sheriff's Office (Sheriff) was looking for him. He had assaulted a man, breaking his nose, and left him unconscious. The Sheriff issued a bulletin for [Virgo's] arrest.
>
> The bulletin, a be-on-the-lookout bulletin, warned officers that [Virgo] was considered armed and unpredictable, and they should handle the matter with extreme caution. The Sheriff's warning was based in part on advice the Sheriff had received from the Department of Corrections and Rehabilitation. That agency had informed the Sheriff that [Virgo] was unpredictable and any arrest should by performed by the Sheriff's special enforcement team (SET), the Sheriff's version of a special weapons and tactics team (SWAT).
>
> In addition, [Virgo] had told Sheriff officers in an earlier contact he was a member of the Hell's Angels and part of "the Filthy Few," a Hell's Angels enforcer group known for violence.
>
> On October 18, 2006, deputies located [Virgo] at a house on Happy Hollow Lane in Newcastle. The SET commander, Lieutenant Jeffrey Ausnow, directed the SET to report and prepare to respond. Lieutenant Ausnow knew [Virgo] from high school. He also knew [Virgo] had felony convictions involving weapons, ammunition, and explosives. Lieutenant Ausnow had been informed [Virgo] was an enforcer for the Hell's Angels and he knew [Virgo] had two active felony arrest warrants, one for possession and discharge of handguns and one for a battery with serious bodily injury.
>
> The SET assembled at the California Highway Patrol office in Newcastle. All SET members were wearing Sheriff's uniforms with helmets and body armor vests. Lieutenant Ausnow briefed the team members on the situation. He directed them to do a "surround and call-out," a standard SWAT-type maneuver where deputies stealthily surround a house so the suspect inside cannot escape or hurt others, and then they give the suspect an opportunity to surrender. If things did not go according to plan, Sergeant Wayne Woo, the SET's second in command and the ground commander, was to give orders.
>
> About 10:00 p.m., the SET arrived at the residence and began surrounding it. The small house was situated on a semirural lot on the northeast corner of the intersection of Happy Hollow Lane and Powerhouse Road. A driveway provided access to the house from Happy Hollow Lane and went along the eastern side of the house, which was also the front of the house.[FN4]
>
> > FN4. The trial witnesses were not consistent in describing which direction the house faced. From comparing photographs of the house with maps, it is apparent the front of the house faced roughly east. We will base our descriptions of the house and its rooms on that fact.

2

The SET approached from the northwest along Powerhouse Road and went into the backyard of the house, and from there the deputies began to take their positions. The main assault team consisted of Sergeant Woo, Sergeant Robert Franz, and Deputies Jason Lockhart and Ben Glau. Their assignment was to go around the north side of the house and take positions on the front or east side of the house.

Another team, consisting of Agent Benjamen Machado and Deputy Jeff Swearingen, was assigned to go around the back of the house on the west side, then around he south side of the house and meet up with Sergeant Woo and his team at the front of the house on the east side.

A third team consisted of Deputies Ty Conners, Ryan West, and Dennis Kemper. This team's responsibility was to cover the southwest corner of the house, including its south and back (west) sides. A fourth team, consisting of Sergeants Dave Powers and Darrell Steinhauer, and Deputy Joshua James Tindall, was assigned to cover the northwest corner of the house, including its north and back sides.

As Agent Machado and Deputy Swearingen approached the house along its south side, they saw a person standing in the driveway speaking on a phone. Both officers announced they were with the Sheriff's office, but the subject quickly retreated into the house. Deputy Swearingen radioed to the others that their mission had been compromised.

Agent Machado went onto the front porch. He heard people moving around inside. He pounded hard on the house beneath the front window and yelled, "Sheriff's department. Probation search. Come to the door."

About that time, Deputies Conners, Kemper, and West were approaching their position on the southwest corner of the house. They heard a noise in a window on the far right of the back of the house. Deputy Conners shined his gun light on the window and saw two males, one of whom was trying to get out. The deputies announced, "Sheriff's department." The male who had been trying to get out of the window abruptly pushed back and yelled, "Fuck." The two males retreated inside the house. Kemper told the others to take cover.

Sergeant Woo and his team took cover behind a Toyota vehicle parked in the driveway parallel to the front door of the house. He began yelling commands, saying, "Sheriff's department. Come out with your hands up." A male from inside the house yelled, "Back up. Back the fuck up. I have a bomb, and I'm going to blow the house up." Sergeant Woo continued to yell commands, and the male inside the house yelled he had C–4 (an explosive), he was going to blow up the house, and everyone needed to move back.

Sergeant Woo decided to forgo the previous plan and introduce tear gas into the house as soon as possible. He gave those orders to Deputy West, who was at the southwest corner of the house, and to Sergeant Powers, who was near the northwest corner of the house. He also ordered the rest of the team to put on their gas masks.

About that time, Sergeant Woo and the other officers heard gunshots from inside the house. The shots continued intermittently. Sergeant Woo could tell when the shots were fired from the front of the house, from deeper inside the house, or from the back of the house. As the male's voice moved to the area of the front kitchen window, it

attracted Sergeant Woo's attention.  He then heard a gunshot, saw the bullet come out of that window, and heard it pass over his head.  He estimated the bullet passed between five and 10 feet above his head.  Deputy Lockhart was standing next to him at that time.

Sergeant Woo, Deputy Lockhart, Sergeant Franz, and Deputy Glau, still taking cover behind the Toyota, heard more shots come from the house toward their direction.  Deputy Lockhart heard shots going over his head and hitting tree branches and debris behind him.  Sergeant Woo testified that "maybe four to seven" gunshots came out from the front of the house towards his direction during the siege.

Sergeant Franz heard rounds entering the trees behind him.  Deputy Glau heard a shot go past him every once in a while.  He would simultaneously hear a shot, hear the shot hit something behind him, and see glass falling from a window.

A police armored vehicle pulled into the driveway behind the parked Toyota, about that time, and Sergeant Franz and Deputy Glau took cover behind it.  Sergeant Woo and Deputy Lockhart stayed by the Toyota.

Once Sergeant Woo confirmed everyone had their gas masks on, Deputy West and Sergeant Powers began shooting tear gas into the house.  After the first volley, the front door opened, and three people came out.  They were directed to crawl away from the site. With the door open, Sergeant Woo's team could see inside the house down a hall that ended in a bathroom.  A bedroom came off each side of the hall by the bathroom.

After more volleys of tear gas, two more people came the open front door, one holding a dog.  While this group was coming out, Sergeant Franz saw a hand holding a handgun come around the back corner of the hall, and he saw the gun fire.  Sergeant Franz yelled, "Gun, gun," and Deputy Glau fired back.  When Sergeant Franz saw the handgun, he thought it was going to be used on him.  Deputy Glau also saw the gun; he was looking straight down the gun's barrel before he fired at it.

The last group of people to exit the house confirmed to the officers that [Virgo] was the only person who remained inside.  Sergeant Woo and Deputy Lockhart moved behind the armored vehicle for cover.

Shots continued to be fired from inside the house.  During the first few minutes of the incident, the shots had come from the front of the house.  By this time, they seemed to Sergeant Woo to be more isolated towards the back of the house.

Deputies West, Conners, and Kemper were taking cover on the southwest side of the house, with Deputy West firing tear gas into the house on the south and west sides.  During this time, they heard gunfire coming from inside the house, but they could not tell whether the shots were being fired in their direction.  Deputy West saw a muzzle flash once through one of the windows on the back west wall but could not tell where the shot was aimed.  Although Deputy West could hear steady gunfire coming from the house, he could not tell where the other gunshots he heard were directed.

Deputy Tindall and Sergeants Steinhauer and Powers were taking cover near the northwest corner of the house.  Deputy Tindall was more towards the northwest corner separated somewhat from Sergeants Steinhauer and Powers.  After seeing the armored vehicle pull up by the front of the house, Deputy Tindall saw a muzzle flash through a window at the back of the house.  The flash was linear in shape, meaning to Deputy Tindall that the shot went perpendicular to his position.  After hearing the shot and seeing

4

the flash, Deputy Tindall fired into the north wall, believing that was where the threat was originating.

After firing, Deputy Tindall heard a male from inside the house say, "Where are you? Where are you, mother fucker?" Then he saw a second muzzle flash and heard a shot. This flash came from the north side of the house. It was "round and flowery," indicating to Deputy Tindall that he was in front of the gun when it was fired. He took cover briefly, realized he was all right, and returned fire. He felt at this point that his life was being threatened.

Located to Deputy Tindall's left, Sergeant Powers, who was shooting tear gas into the house, and Sergeant Steinhauer, who was assisting Sergeant Powers by shining a light at the house, also heard a gunshot and saw a muzzle flash come out of the north side of the house. Both Sergeant Powers and Sergeant Steinhauer could tell the gun had been aimed in their direction because the flash was round, as if they were looking straight at it.

Sergeant Powers began to make verbal contact with [Virgo]. He announced he was from the Sheriff's office, and that [Virgo] could exit out the front door if he threw his weapons out. [Virgo] said he wanted to surrender. Sergeant Powers told him to throw his weapons out the window and exit out the front door with his hands up. After Sergeant Powers made several attempts to get [Virgo] to comply, [Virgo] threw something out the window. Sergeant Powers advised Sergeant Woo of this development by radio. He continued to advise [Virgo] to surrender. Then Sergeant Powers learned by radio that [Virgo] was crawling towards the front door.

[Virgo] appeared in the hall outside the bedroom, empty hands out, and he started crawling out. He took one or two steps, and then collapsed. Sergeant Woo told him to keep crawling towards his voice, but [Virgo] kept saying he could not because he was hurt. Concerned by [Virgo's] refusal to follow his instructions, Sergeant Woo ordered Sergeant Franz to Taser [Virgo]. When Sergeant Franz announced he was going to Taser him, [Virgo] immediately popped up and quickly crawled to where the officers directed him. He was there taken into custody. His only injuries were superficial cuts to his finger and ear.

Detectives located two handguns on the ground outside the northwest bedroom's window on the north side of the house. One was a Ruger nine-millimeter semiautomatic handgun, and the other was a Czech-made semi-automatic .45–caliber handgun. The slide of the Ruger had been damaged, and it had a dry reddish substance on it. [Virgo's] fingerprints were on the .45–caliber handgun and its clip.

Detectives located gun casings inside the house. They found five fired casings in the hallway, seven fired casings in the northwest bedroom, two fired casings in the southwest bedroom, and four fired casings in the bathroom. They also found one fired bullet outside the house near where Deputy Tindall took cover, and another fired bullet off the front or east side of the house.

A criminalist from the California Department of Justice, Michelle Terra, conducted a trajectory analysis from the bullet holes found in the house. She could not determine the trajectory of a bullet that was fired through an open door or window, as it left no bullet hole to analyze. However, from examining the intact bullet holes, Terra verified that at least 14 shots were fired from inside the house towards the outside, and of

those, 10 actually left the house.  One of the shots that was fired from the northwest bedroom exited at a height of approximately five feet seven inches above the ground in the direction of an outbuilding and oak tree.  Another shot that was fired from that bedroom exited approximately seven feet above the ground through a window and screen out the back to the west of the property.  Another shot was fired high out a kitchen window towards the northeast.  And Two outgoing shots were fired in the direction of the front porch area, one of which exited at a height of approximately five feet four inches above the ground and over the parked Toyota.  Terra also testified that nine of the shots she documented coming from inside the house were aimed at the ceiling.[FN5]

> FN5.    Terra also documented a total of 57 rounds that went into the house from the outside.

During his booking at the jail, [Virgo] was boisterous and loud.  He said to everyone present, "I fired 55 rounds.  And I didn't get fucking killed.  I must be a fucking loser.  [¶] I've got priors from way back.  I can't believe Jeff [(Lieutenant Jeffrey Ausnow)] didn't believe me.  I told him I had C–4."  Then [Virgo] held up his hand and said, "They blew my mother fucking gun apart.  Got my finger.  Got it right in the side here.  The slide wouldn't go back.  Blew it apart.  So I went for my [SIG Sauer] and reloaded."

Scott and Jolene Truschke were two of the people inside the house who crawled out to safety during the shooting.  Scott was the person who was using the phone outside on the driveway when the deputies first approached.  He had seen [Virgo] earlier that evening in the house with two guns in his hands.  In an interview with police, Scott reported that "Dave got the guns and said, 'Okay.'"  "I know he had two guns."

Jolene Truschke also had seen two handguns in the house that evening.  In her interview with police, Jolene said [Virgo] had fired six or seven shots.  She had also heard [Virgo] say "he ain't going down like that, you know.  He ain't getting taken.  He's going to go down blazing, you know, guns and all."

*People v. Virgo*, 166 Cal. Rptr. 3d 384, 387-91 (Cal. Ct. App. 2013).

At the conclusion of trial, the jury found Virgo guilty of all counts and also found true all special allegations.  The trial court subsequently sentenced Virgo to an aggregate imprisonment term of 46 years and 8 months, plus 75 years to life imprisonment.

Through counsel, Virgo appealed his conviction, arguing that: 1) there was insufficient evidence that Virgo had the specific intent to kill, and the attempted murder convictions should be reversed; 2) there was insufficient evidence of deliberation and premeditation, and the

attempted murder convictions should be reduced; 3) the appellate court should independently review the transcript of the *in camera* proceedings and the documents submitted to determine whether the trial court erred in denying Virgo's *Pitchess* motion[2] for discovery of information in a law enforcement officer's personnel file; 4) the trial court erred in admitting inflammatory Hell's Angels evidence; 5) the testimony of a prosecution witness that Virgo was a suspect in a killing was incurably prejudicial; and 6) the cumulative effect of the aforementioned errors violated Virgo's constitutional rights.  On December 30, 2013, the Court of Appeal issued a reasoned, partially published opinion unanimously reversing the judgment as to Counts 9, 11, 15, 17, and 19 after agreeing with Virgo that sufficient evidence did not support all 10 convictions of attempted murder of a peace officers, and also amended the abstract as to Count 20.  *Virgo*, 166 Cal. Rptr. 3d at 392-94.  The appellate court affirmed the judgment in all other respects.  *Id.* at 394-95.  Virgo filed a counseled petition for review in the California Supreme Court, raising all claims unsuccessfully raised before the Court of Appeal, which was denied without comment on April 16, 2014.  His conviction became final on direct review 90 days later, when his time to file a petition for certiorari in the U.S. Supreme Court expired on July 15, 2014.  *See Jiminez v. Quarterman*, 555 U.S. 113, 119 (2009); *Spitsyn v. Moore*, 345 F.3d 796, 798 (9th Cir. 2003).

---

[2]     In *Pitchess v. Superior Court*, 522 P.2d 305 (Cal. 1974), the California Supreme Court recognized that a criminal defendant may, in some circumstances, compel the discovery of evidence in the arresting law enforcement officer's personnel file that is relevant to the defendant's ability to defend against a criminal charge.  In 1978, the California Legislature codified the privileges and procedures surrounding what had come to be known as a *Pitchess* motion through the enactment of California Penal Code §§ 832.7 and 832.8 and California Evidence Code §§ 1043 through 1045.  *People v. Mooc*, 36 P.3d 21, 24 (Cal. 2001) (citations omitted).

Virgo timely filed a counseled Petition for a Writ of Habeas Corpus in this Court on July 15, 2015. Docket No. 1 ("Petition"); *see* 28 U.S.C. § 2244(d)(1)(A).

## II. GROUNDS/CLAIMS

In his counseled Petition before this Court, Virgo raises the following five grounds for relief: 1) there was insufficient evidence that Virgo had the specific intent to kill, and the attempted murder convictions should be reversed; 2) there was insufficient evidence of deliberation and premeditation, and the attempted murder convictions should be reduced; 3) the trial court erred in admitting inflammatory Hell's Angels evidence; 4) the testimony of a prosecution witness that Virgo was a suspect in a killing was incurably prejudicial; and 5) the cumulative effect of the aforementioned errors violated Virgo's constitutional rights.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the

relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). A summary denial is an adjudication on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

IV. DISCUSSION

A.      <u>Insufficiency of the Evidence</u> (Grounds 1, 2)

In his first two grounds for relief, Virgo argues that the evidence was insufficient to support his convictions for five counts of premeditated murder.  Specifically, he avers in Ground 1 that there was insufficient evidence that he had the specific intent to kill and, in Ground 2, contends that there was insufficient evidence of deliberation and premeditation.  As articulated by the Supreme Court in *Jackson*, the constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see also McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard).  This Court must therefore determine whether the California court unreasonably applied *Jackson*.  In making this determination, this Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial.  *Jackson*, 443 U.S. at 318-19.  Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution."  *Id.* at 326.

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law.  *See Engle v. Isaac*, 456 U.S. 107, 128 (1982).  Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set

10

forth in state law. *Jackson*, 443 U.S. at 324 n.16. This Court must also be ever mindful of the deference owed to the trier of fact and the sharply limited nature of constitutional sufficiency review. *Juan H. v. Allen*, 408 F.3d 1262, 1275 (9th Cir. 2005). A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam); *see West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . .").

Under California law, "[m]urder is the unlawful killing of a human being, . . . with malice aforethought." CAL. PENAL CODE § 187(a). First degree murder includes murder perpetrated by "any . . . kind of willful, deliberate, and premeditated killing[.]" CAL. PENAL CODE § 189. Attempted premeditated murder requires proof that: (1) the defendant had the specific intent to kill the alleged victim; (2) he committed a direct but ineffectual act toward accomplishing the intended killing; and (3) the defendant acted willfully, deliberately, and with premeditation. *See* CAL. PENAL CODE §§ 664, 187(a).

Although motive is not an element of the crime of attempted murder, evidence of motive is often probative of intent to kill. *People v. Smith*, 124 P.3d 730, 741 (Cal. 2005). Additionally, aside from motive, intent to kill may be inferred from a perpetrator's acts and the circumstances of the crime. *Id.* In particular, the act of purposefully firing a gun at another at close range gives rise to an inference of intent to kill, regardless if there is any showing of a particular motive to kill the victim. *Id.* at 742.

The type of evidence which courts have found sufficient to sustain a finding of premeditation and deliberation fall into three basic categories: (1) facts about how and what the defendant did prior to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing (i.e., planning activities); (2) facts about the defendant's prior relationship and/or conduct with the victim from which the jury could reasonably infer a motive to kill the victim; and (3) facts about the manner of the killing from which the jury could infer a preconceived design to take the victim's life. *People v. Anderson*, 447 P.2d 942, 949 (Cal. 1968). These three categories of evidence are not an exhaustive list, but "provide guidelines" for analysis. *People v. Perez*, 831 P.2d 1159, 1163 (Cal. 1992); *see also Davis v. Woodford*, 384 F.3d 628, 640 & n.3 (9th Cir. 2004) (applying *Anderson* guidelines on federal habeas review but noting admonition of California Supreme Court that *Anderson* did not define elements of first degree murder or definitively state prerequisites for proving premeditation and deliberation in every case, but rather was intended only as a framework to aid in appellate review) (citation and quotations omitted).

The Court of Appeal addressed the sufficiency of the evidence supporting Virgo's attempted murder convictions as follows:

> " ' "The mental state required for attempted murder has long differed from that required for murder itself. Murder does not require the intent to kill. Implied malice—a conscious disregard for life—suffices. [Citation.]" (*People v. Bland* (2002) 28 Cal.4th 313, 327, 121 Cal.Rptr.2d 546, 48 P.3d 1107 (*Bland*).) In contrast, "[a]ttempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." [Citations.]' [Citation.]" (*People v. Perez* (2010) 50 Cal.4th 222, 229–230, 112 Cal.Rptr.3d 310, 234 P.3d 557 (*Perez*), fn. omitted.)
>
> Thus, in order for [Virgo] to be convicted of each of the 10 attempted murders he was charged with committing, the prosecution had to prove he acted with the specific intent to kill each victim. " ' "[G]uilt of attempted murder must be judged separately as to each alleged victim." ' ( [*People v. Stone* (2009) 46 Cal.4th 131,] 141[92 Cal.Rptr.3d 362, 205 P.3d 272] [ (*Stone*) ], quoting *Bland*, at p. 331[121 Cal.Rptr.2d 546, 48 P.3d

1107].) '[T]his is true whether the alleged victim was particularly targeted or randomly chosen.' (*Stone*, at p. 141[92 Cal.Rptr.3d 362, 205 P.3d 272].)" (*Perez*, *supra*, 50 Cal.4th at p. 230, 112 Cal.Rptr.3d 310, 234 P.3d 557.)

" ' "[T]he act of firing toward a victim at a close, but not point blank, range 'in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill....' [Citation.]" [Citations.]' [Citation.]" (*Perez*, *supra*, 50 Cal.4th at p. 230, 112 Cal.Rptr.3d 310, 234 P.3d 557.)

To establish specific intent, the prosecution does not need to show [Virgo] intended to kill a particular person. In *Stone*, supra, 46 Cal.4th 131, 92 Cal.Rptr.3d 362, 205 P.3d 272, our Supreme Court determined a shooter who fires a single shot into a group of people, intending to kill one of the group, but not knowing or caring which one, could be convicted of a single count of attempted murder. (Id. at p. 134, 92 Cal.Rptr.3d 362, 205 P.3d 272.) The court explained that, "The mental state required for attempted murder is the intent to kill a human being, not a *particular* human being." (*Ibid*. original italics.)

However, where there are multiple possible victims of the attempted murder, the prosecution must establish that [Virgo] intended to kill each victim for each count charged. In *Perez*, *supra*, 50 Cal.4th 222, 112 Cal.Rptr.3d 310, 234 P.3d 557, the high court determined a shooter who fired a single shot from a moving car into a group of seven peace officers and a civilian could be convicted of only one count of attempted murder, not eight. Where the shooter intended to kill someone, without targeting any particular individual and without using a means of force calculated to kill everyone in the group, he could be guilty of only a single count of attempted murder. (Id. at p. 225, 112 Cal.Rptr.3d 310, 234 P.3d 557.)

In addition to proving [Virgo] intended to kill, the prosecution in this case sought to prove [Virgo's] attempts to kill were willful, deliberate, and premeditated. " 'A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance. [Citations.] "The process of premeditation ... does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. ...' [Citations.]" ' [Citation.]" (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419, 64 Cal.Rptr.3d 721, 165 P.3d 512.)

We have no doubt [Virgo] intended to kill, and that his attempts to kill were willful, deliberate, and premeditated. He told his friends when the deputies arrived that he was not going to be taken and he was going to go down with guns blazing. He fired directly at deputies through the open front door. At one point in the shooting, he yelled to the deputies, "Where are you? Where are you, mother fucker?" And he continued firing towards them after that. These facts show [Virgo] reflected on the circumstances and arrived at a judgment. He was going to kill or be killed.

Thus, to affirm each of [Virgo's] 10 convictions of attempted murder, we search the record for substantial evidence indicating [Virgo] committed a direct but ineffectual act toward killing each officer. We look to see if he fired at each of the 10 victims in a

manner that could have killed them had [Virgo's] aim been more on target. Obviously, [Virgo] cannot be guilty of attempting to murder someone who is taking cover on the ground outside when [Virgo] fires his gun up into the ceiling.

The information charged [Virgo] with attempting to kill Sergeant Woo, Deputy Lockhart, Deputy Glau, Sergeant Franz, Sergeant Steinhauer, Sergeant Powers, Deputy Tindall, Deputy West, Deputy Conners, and Deputy Kemper. Sufficient evidence supports [Virgo's] convictions of attempting to kill Woo, Lockhart, Franz, Glau, and Tindall.

Woo, Lockhart, Franz, and Glau each testified that multiple shots came their direction when they were taking cover by the Toyota parked in front of the house. All of them heard shots go over their heads and hit things behind them. Sergeant Woo stated four to seven gunshots came out of the front of the house toward him, and he was standing next to the other three. [Virgo's] firing four to seven shots at four peace officers is sufficient evidence in these circumstances to convict him of attempting to murder each officer.

Sergeants Steinhauer and Powers and Deputy Tindall had taken cover at the northwest corner of the house, with Sergeant Powers firing tear gas. All three of these officers testified to seeing only one shot come out of the northwest bedroom's north window that was aimed at them. The other shot Deputy Tindall saw go out the bedroom's west window was aimed away from him. Under this record, [Virgo] could be convicted of attempting to murder one of the three officers, but not all three.

The strongest evidence is that [Virgo] attempted to kill Deputy Tindall. After shooting into the northwest bedroom and hearing [Virgo] say, "Where are you? Where are you, mother fucker?" Deputy Tindall saw a flash come at him from the north wall of the house. The muzzle flash was "round and flowery," indicating Deputy Tindall was in front of the gun when it was fired. He took cover, confirmed he was all right, and returned fire. He felt at that moment that his life was being threatened. This is sufficient evidence to sustain [Virgo's] conviction of attempting to murder Deputy Tindall. Because there is no evidence [Virgo] also fired separate shots at Sergeants Steinhauer and Powers, there is insufficient evidence to sustain the convictions as to them.

As for the other officers, Deputies West, Conners, and Kemper, they provided no evidence that they were directly fired upon. They were positioned at the southwest corner of the house. They heard shots coming from inside and outside the house, but they could not tell where the shots were coming from. The only exception was one shot Deputy West saw leave the back window, but he could not tell where the shot was aimed. This evidence is insufficient to support a conviction of attempted murder against Deputies West, Conners, and Kemper.

The Attorney General argues there is sufficient evidence to support all 10 convictions of attempted murder. She relies on the number of spent casings found inside the house, the 14 outgoing shots found by the trajectory analysis, and [Virgo's] assertion at jail that he fired 55 rounds.

These facts, however, do not demonstrate [Virgo] had a specific intent to kill each officer and that he in fact committed a discrete (or an identified) direct but ineffectual act toward killing each one. Many of [Virgo's] shots were aimed up at the ceiling and over

where some of the officers were located. The Department of Justice criminalist testified that nine of the 14 shots she determined were made from inside the house went into the ceiling. While [Virgo] may have intended with each shot aimed at human height to kill every officer he could before he was killed, there was insufficient evidence showing he made a direct but ineffectual shot towards each officer. Without such evidence, all 10 convictions of attempted murder cannot stand.

We need not remand this case for resentencing. The trial court imposed consecutive sentences for the attempted murders of Woo, Lockhart, Glau, Franz, and Tindall (counts one, three, five, seven, and thirteen of the information), the convictions we here affirm. The court imposed concurrent sentences for the attempted murders of the other five officers, Steinhauer, Powers, West, Conners, and Kemper (counts nine, eleven, fifteen, seventeen, and nineteen). Because we reverse only the latter five convictions, we order the clerk of the trial court to prepare an amended abstract of judgment striking the reversed convictions and their enhancements and sentences.

*Virgo*, 166 Cal. Rptr. 3d at 392-94.

Here, Virgo appears to argue, as he did before the state courts on direct appeal, that there was insufficient evidence to support his remaining attempted murder convictions by attacking the evidence against him and again reiterating his version of events. But Virgo misperceives the role of a federal court in a habeas proceeding challenging a state-court conviction. Under *Jackson*, the role of this Court is to simply determine whether there is any evidence, if accepted as credible by the jury, sufficient to sustain conviction. *See Schlup v. Delo*, 513 U.S. 298, 330 (1995). In this case, the appellate court determined that there was sufficient evidence to support the convictions they affirmed, based on, among other things, Virgo's statements to his friends and the testimony of those officers that shots were fired in their direction and went over their heads. Although it might have been possible to draw a different inference from the evidence, this Court is required to resolve that conflict in favor of the prosecution. *See Jackson*, 443 U.S. at 326. Virgo bears the burden of establishing by clear and convincing evidence that these factual findings were erroneous. 28 U.S.C. § 2254(e)(1). He has failed to carry such burden. The record does not compel the conclusion that no rational trier of fact could have found that

Virgo was guilty of the attempted murder convictions that were affirmed upon direct appeal, especially considering the double deference owed under *Jackson* and AEDPA. Virgo is therefore not entitled to relief on either of his legal insufficiency claims.

B. <u>Evidentiary Error</u> (Ground 3)

Virgo next contends that the trial court prejudicially erred by allowing into evidence testimony that Virgo was an enforcer for the Hell's Angels. The Supreme Court has acknowledged its "traditional reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts." *Crane v. Kentucky*, 476 U.S. 683, 689 (1986). The Supreme Court has further made clear that federal habeas power does not allow granting relief on the basis of a belief that the state trial court incorrectly interpreted the state evidence code in ruling on the admissibility of evidence. *Estelle*, 502 U.S. at 72 (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

The erroneous admission of evidence does not provide a basis for federal habeas relief unless it rendered the trial fundamentally unfair in violation of due process. *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009). Evidence violates due process only if "there are no permissible inferences the jury may draw from the evidence." *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991) (emphasis omitted). A writ of habeas corpus will be granted for an erroneous admission of evidence "only where the 'testimony is almost entirely unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings.'" *Mancuso v. Olivarez*, 292 F.3d 939, 956 (9th Cir. 2002), *overruled on other grounds by Slack v. McDaniel*, 529 U.S. 473 (2000).

The Court of Appeal rejected Virgo's evidentiary claim on direct appeal as follows:

> The trial court admitted the evidence for the sole purpose of determining whether the actions of the peace officers were lawful when considering the circumstances known by them at that time. [Virgo] had asserted the defenses of self-defense and excessive force, and the court held the evidence of his alleged gang involvement was relevant to understanding the circumstances under which the officers acted and whether they used reasonable force. However, the court admitted the evidence solely for that purpose. It instructed the jury it was to consider the evidence "solely for the purpose of determining the lawfulness of the actions of law enforcement and no other."
>
> By so limiting the jury's consideration of the evidence, the trial court ensured the evidence would not become unduly prejudicial. The jury was instructed not to consider the evidence for its truth, and we presume the jury followed that admonition. *(People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17.)
>
> This case is unlike *People v. Memory* (2010) 182 Cal.App.4th 835, relied upon by [Virgo], where we found admission of gang evidence to be prejudicial error. In that case, the evidence of that defendant's membership in the Jus Brothers Motorcycle Club was admitted to show the defendant's criminal disposition. Here, the evidence served a much more restricted purpose, and the jury did not consider it for determining [Virgo's] disposition or the truth of his actions. Under this circumstance, the trial court did not abuse its discretion in admitting the evidence for its limited purpose.

Virgo fares no better on federal habeas review. It was not wholly unreasonable for the California Court of Appeal to conclude that the evidence of his connection to the Hell's Angels was relevant to refute Virgo's claim of self-defense because it put into question whether the actions of the peace officers were lawful and whether they used reasonable force in light of what they may have known or believed about Virgo. And even if constitutional error occurred, the admission of the evidence did not have a "substantial and injurious effect or influence in determining the jury's verdict," *see Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), in light of what the Court of Appeal reasonably described as "clear and convincing" proof of Virgo's guilt in attempting to murder peace officers. Furthermore, the jury was given a limiting instruction about the Hell's Angels evidence, and it is presumed to have followed that instruction. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (a jury is presumed to have followed the

17

instructions given to them).  Accordingly, this Court cannot find, based on the record before the

state court, that the Court of Appeal's determination either contravened or unreasonably applied

clearly-established federal law.

In his Traverse, Virgo attaches an article from the Auburn Journal, which quotes an

anonymous jury foreperson as stating, "I'm concerned about some of the people in the audience

related to Virgo . . . .  He's in Hell's Angels, and we obviously consider that a dangerous group."

Docket No. 20-1 at 3.  According to Virgo, that article "demonstrates that not only did the jury

violate an order from the court, the evidence of petitioner's alleged membership of the Hell's

Angels was so inflammatory the jury was not able to evaluate the evidence rationally and

carefully and instead convicted him on every count."  Docket No. 20 at 4.  However, this Court

is generally precluded from supplementing the record with facts adduced for the first time in

federal proceedings when a petitioner's claim has been adjudicated on the merits in state court.

*See Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2001) (holding that new evidence presented at

evidentiary hearing in federal court cannot be considered in assessing whether state court's

decision "was contrary to, or involved an unreasonable application of, clearly established

Federal law" under § 2254(d)(1)).  The exception is where, considering only the evidence before

the state court, the petitioner has satisfied § 2254(d); in such case, the federal court may

"evaluate the claim de novo, and . . . consider evidence properly presented for the first time in

federal court."  *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014); *see also Johnson v. Finn*, 665

F.3d 1063, 1069 n.1 (9th Cir. 2011) (holding that *Pinholster* did not preclude the district court

from conducting an evidentiary hearing after concluding the state court of appeal's decision was

contrary to clearly established law under § 2254(d)(1)).  Because, as discussed above, the Court

of Appeal's determination was reasonable, the Court may not consider as evidence supporting his claim the article first presented in these federal proceedings,[3] and Virgo is not entitled to relief on his evidentiary claim.

C.    Incurable Error (Ground 4)

Virgo next avers that a witness's testimony that Virgo was a suspect in a killing was so damaging that it was incurable. On direct appeal, the Court of Appeal laid out the following background underlying this claim:

> During redirect examination, the prosecutor asked Jolene Truschke, one of the women who crawled out of the house during the shooting, whether she had heard [Virgo] talk about a Detective Addison. She had, but she could not remember clearly what he had said. The prosecutor asked her if [Virgo] had said he was angry with Detective Addison. She said he had not. The prosecutor next asked whether [Virgo] had said anything about being a suspect in a shooting in Pemyn. Jolene responded, "I recall something about a killing in Pemyn or something. I recall a little bit." Defense counsel objected immediately, and the court sustained the objection and struck the testimony.
>
> The prosecution had been attempting to elicit from Jolene evidence of [Virgo's] state of mind immediately before the incident, that he knew he was a suspect in another shooting and believed he was being set up for that shooting by Detective Addison. However, because Jolene had suggested [Virgo] was a suspect in a *killing,* defense counsel asked for a curative instruction. The prosecutor, too, did not know Jolene would use the word "killing" instead of "shooting," and he agreed to stipulate [Virgo] was not a suspect in a killing.
>
> The court agreed to a stipulation by counsel and an admonishment to the jury, and it denied [Virgo's] request for a mistrial. The court thereafter instructed the jury as follows: "[L]ast Tuesday, Miss Jolene Truschke testified. [The prosecutor] asked Miss Truschke about statements made by [Virgo] regarding being a suspect in a shooting. Miss Truschke responded, "I recall something about a killing in Penryn or something." The prosecution and the defense stipulate that [Virgo] was never a suspect in a killing in Penryn. The Court ordered that that testimony was stricken from the record at the time.

---

[3]    Moreover, Virgo has not demonstrated nor explained why the "new" information or evidence submitted with his traverse could not have been raised before the state court prior to filing this action. Allowing the introduction of evidence or an evidentiary hearing on issues which could have been raised in the state court proceedings would only serve to provide "an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." *Williams*, 529 U.S. at 437.

The parties have agreed to give you a further admonishment specifically that the jury is not to use Miss Truschke's inaccurate statement for any reason and is required to disregard the statement in its entirety. And you'll get this along with the jury instructions as well."

The appellate court subsequently concluded that, contrary to Virgo's argument, any prejudice was cured. Virgo now reasserts in the Petition that the prejudicial effect of the evidence could not be cured, and the trial court should have declared a mistrial.

As a general rule, the drastic remedy of a mistrial should not be granted where the prejudice from improperly admitted evidence is not substantial and where curative instructions can mitigate the harm. *See, e.g.*, *United States v. Browne*, 829 F.2d 760, 766 (9th Cir. 1987). Under California law, a trial court has broad discretion to grant a mistrial. *See People v. Williams*, 148 P.3d 47, 72 (Cal. 2007).

As an initial matter, to the extent that Virgo is alleging a violation of state law in the court's denial of his mistrial motion, his claim is not cognizable on federal habeas review. *See Estelle*, 502 U.S. at 67-68. But to the extent that he is alleging a federal due process violation from the prejudicial effect of the testimony, he has raised a cognizable federal claim. In order to establish a due process violation from an alleged error, such as the denial of a mistrial motion, a habeas petitioner must show that the error resulted in a trial that was fundamentally unfair. *See id.* at 70-71, 75; *Hayes v. Ayers*, 632 F.3d 500, 515 (9th Cir. 2011). The Supreme Court has defined the category of infractions that violate fundamental fairness very narrowly. *See Estelle*, 502 U.S. at 73.

Here, the improper testimony did not render Virgo's trial fundamentally unfair. First, the testimony itself was isolated and nondescript, and it was not so inflammatory that it would render the jury unable to fairly consider the evidence. *See, e.g.*, *United States v. Allen*, 425 F.3d

1231, 1236 (9th Cir. 2005) (mistrial was not warranted based on witness's isolated reference to defendant's prior incarceration); *see also United States v. Zitt*, 714 F.3d 511, 514 (7th Cir. 2013) (a "brief and nondescript" reference to a defendant's criminal history would not prevent the jury from fairly evaluating the evidence). As the Court of Appeal noted:

> The circumstances surrounding the statement were not so extreme as to prevent any prejudicial effect from being cured. The statement did not go to the primary issue of whether [Virgo] intended to kill the officers. That [Virgo] may have said something to the witness about a killing in Penryn did not admit [Virgo] did the killing, nor did it prove he had the specific intent to kill the officers in this incident.

Importantly, "this one stray remark was not highlighted in any way before the jury." *United States v. Crawford*, 61 F. App'x 325, 326 (9th Cir. 2003). As the Court of Appeal reasoned:

> The statement was not unduly emphasized by the manner in which it was presented to the jury. It was made on redirect examination, and it caught everyone off guard. Because the prosecutor did not know the statement was going to be made, he made no attempt to emphasize it to the jury. To the contrary, the prosecutor stipulated that the statement was false, and the court informed the jury that both the defense and the prosecution stipulated [Virgo] was "never a suspect in a killing in Penryn."

Moreover, the trial court took appropriate corrective action. As soon as the statement was made, the trial court struck the testimony and gave a curative instruction with the parties' stipulation. The trial court later instructed the jury to disregard any testimony that was stricken. It is presumed that the jurors followed the trial court's instructions. *See Weeks*, 528 U.S. at 234; *see also Hayes*, 632 F.3d at 515 (finding no due process violation from denial of mistrial based on witness's testimony that petitioner had hired someone to murder her, where the trial court sustained an objection and ordered the jury to disregard it).

Finally, as the Court of Appeal concluded, substantial independent evidence exists to support the jury's verdict. The record supports the Court of Appeal's conclusion that "proof of

[Virgo's] guilt in attempting to murder peace officers in this case was clear and convincing." It is therefore not likely that the improper statement affected the verdict. *See United States v. Aichele*, 941 F.2d 761, 765 (9th Cir. 1991) (holding, in case affirming the denial of a mistrial where testimony concerning a defendant's prior incarceration was erroneously introduced, that, "[i]f the case against a defendant is very strong, though not overwhelming, and the reviewing court is unconvinced that the admission of the evidence influenced the outcome of the case, the court may uphold the verdict"). Accordingly, Virgo is not entitled to relief on this claim.

D.      Cumulative Error (Ground 5)

Finally, Virgo avers that the cumulative effect of the trial errors warrants reversal of the judgment against him. "While the combined effect of multiple errors may violate due process even when no single error amounts to a constitutional violation or requires reversal, habeas relief is warranted only where the errors infect a trial with unfairness." *Peyton v. Cullen*, 658 F.3d 890, 896-97 (9th Cir. 2011) (citing *Chambers v. Mississippi*, 401 U.S. 284, 298, 302-03 (1973)). Such "infection" occurs where the combined effect of the errors had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623 (citation omitted). In other words, where the combined effect of individually harmless errors renders a criminal defense "far less persuasive than it might [otherwise] have been," the resulting conviction violates due process. *See Chambers*, 401 U.S. at 294. As discussed throughout this opinion, however, Virgo does not allege any claims that amount to error, and thus he demonstrates no errors that can accumulate to a level of a constitutional violation. *See Mancuso*, 292 F.3d at 957. Accordingly, Virgo is not entitled to relief on his cumulative error claim.

## V. CONCLUSION AND ORDER

Virgo is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)). Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals. *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: August 13, 2018.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge
